## MURRAY v. MURRAY, et ux.

### [No. 2915, Sept. 10, 1925.]

#### SYLLABUS BY THE COURT

1. An action by a married woman against the parents of plaintiffs husband for alienation of her husband's affections will lie, even though plaintiff's husband has not completely and in a literal sense abandoned her.

2. The presumption that the advice of a parent to his child is made in good faith is overcome, where interference is shown, and no reason or excuse for the same can be deduced from the circumstances.

3. Where court, over objection, permitted plaintiff to testify as to the contents of a letter of the parent to the husband of plaintiff, the objection being upon the ground that the letter was not sufficiently accounted for to allow secondary evidence of its contents, the error, if any, of the court, was

technical and immaterial, in view of the testimony of the parent that no such letter was ever written.

. 4.   Letters written to plaintiff by her husband, showing a deep affection for her, were admissible to rebut claim of defendants that no affection existed between them and hence none to be lost; such communications not violating the priviliged communication or the hearsay evidence rules.

5.   In an action by the wife for alienation of her husband's affections, statements of her husband would not be competent evidence of affirmative hostile actions on the part of the defendants, but, so far as such statements tend to show the condition of her husband's mind and feelings toward the plaintiff at the time, and the effect of the conduct of the defendants upon the affections of her husband for her, they are competent for this limited purpose.

Appeal from District Court, Bernalillo County; Hickey, Judge.

Action by Adelaide Murray against D. E. Murray and wife. Judgment for plaintiff, and defendants appeal. Affirmed, and remanded with directions.

Hanna & Wilson and George Lougee, all of Albuquerque, for appellants.

E. W. Dobson, of Albuquerque, for appellee.

### OPINION OF THE COURT

PARKER, C. J.   The appellee (plaintiff) brought an action for damages against appellants (defendants) for the alienation of plaintiff's husband, and recovered a verdict and judgment for $12,500.   The defendants are the father and mother of plaintiff's husband. Counsel for defendants argue that there was not sufficient legal evidence to support the verdict.

[1, 6] 1.   It is first urged that the gist of the action for the alienation of the affections of a spouse is the loss of consortium. It is then argued, quoting from the testimony of the plaintiff, that she had already herself broken the conjugal relation by locking the husband out of her room. This is a misconception of the scope and meaning of consortium. Consortium means much more than the mere sexual relation, and consists also in that affection, companionship, conjugal love, fellow-

ship, and assistance so necessary to a successful marriage relation. Rott v. Goehring, 33 N. D. 413, 157 N. W. 294, L. R. A. 1916E, 1086, Ann. Cas. 1918A, 643; 13 R. C. L. "Husband and Wife," § 517; 30 C. J. "Husband and Wife," § 979.

The real happiness of marriage may be destroyed by the loss of the spouse's affection, kindness, and friendship, and yet the parties may, for reasons of convenience, expediency, welfare of children, or public opinion, submit to and continue the relation, although the principal joy and happiness thereof has been destroyed by the wrongful action of some third person. It follows, therefore, that counsel are in error in this contention.

[2] 2. Counsel for defendants argue generally that, laying aside all questions of admissibility, the evidence is insufficient to support the verdict. The proofs of plaintiff show that the parties were married and living in Santa Fe when the mother came to visit them on account of the illness of the son, plaintiff's husband. The mother at once showed a marked dislike of plaintiff, and stated to her son that she could not see why he had married a Southern girl; that he had been raised differently; asked her son if he would not be glad to get home and have some of mother's good cooking; that plaintiff should do the work of the household without a servant. This visit, lasting about three weeks, terminated in considerable ill feeling between the two women. Plaintiff next saw defendants at their home in Big Rapids, Mich., in the fall of 1917. While there, she overheard a conversation between her husband and his father, in which the father told his son that he had just as well get rid of his wife; that his mother disliked plaintiff, and that she had a disposition to have her way, and that she would in time force the husband to leave his wife; that the son had better divorce the plaintiff before he left for overseas, as she would not be faithful to him while he was gone. All of the parties went from Michigan to Washington, D.

C., and stayed a while with plaintiff's mother in a suburb of the city. They next met in the Palmer House in Chicago, where the mother stated that she would not stay under the same roof or in the same building with plaintiff, and left the hotel, going to a hospital for treatment. The plaintiff's husband went overseas with the American Expeditionary Forces, and plaintiff went to live with her mother near Washington, D. C., where she gave birth to a child, which died at birth. During this time, defendants gave plaintiff no aid or consolation whatever. Upon the husband's returning home from overseas plaintiff and he went directly to Silver City, N. M., where they resided for some time.

In the fall of 1919, the mother wrote the son a letter to Silver City in which she accused plaintiff of being "common white trash," and a woman of immoral character, and threatened that they (both parents) would disinherit the son if he did not get rid of plaintiff. The son showed the letter to plaintiff, and it was read by others, but it was not produced at the trial, the son having kept it. In June, 1922, both defendants came to Albuquerque, to which place plaintiff and her husband had removed. They came unannounced and registered at a local hotel. They phoned the son, and plaintiff and her baby were invited by the son to accompany him to the hotel, while, as he said, he was making a professional call. He went into the hotel, met the defendants and visited with them for an hour or so, plaintiff and the baby remaining in the car. The three then came out of the hotel to where plaintiff was in the car. The son asked defendants to get into the car and all drove to the home of plaintiff, and the son and defendants remained until about 10 o'clock that night. About two or three days later, plaintiff and the son were in their car and met defendants on the street, picked them up and all went for a ride.

Plaintiff next saw defendants at her home, where she had invited them to dinner. When her husband came in over an hour late for dinner, he was in an angry mood, and told plaintiff if she had anything

against his parents, the defendants, to go right in and
have it out with them. He pushed her into the room
where they were, and she told the mother that, as she
had been the cause of all the trouble between her and
her husband, she could not expect to entertain the
family. The defendants and the son, plaintiff's hus-
band, left the house, and the son did not reappear for
three or four days. Then he came for one meal a day
at 5 p. m., and slept at the house, coming in from 10
p. m. to midnight. He frequently used brutal and pro-
fane language to plaintiff, using the "white trash"
expression of his mother, said he did not love plaintiff,
and he was going to leave her and live with defendants.
This condition of affairs continued until July 8, 1922,
when plaintiff filed her complaint in this case.
The husband thereupon softened much in his demeanor
toward plaintiff, but in about ten days left her and
their baby, and was not seen again by them until the
day of the trial, where he was present but did not
testify.

The testimony of defendants is simply a denial of
the charges of the plaintiff. They also produced wit-
nesses to show that plaintiff and her husband frequent-
ly quarreled and did not live very happily together,
but no effort was made to show that plaintiff was not
a good wife or that there was any reason why her hus-
band should separate from her, or any reason or ex-
cuse for the alleged conduct of defendants. Under all
these circumstances, it is clear that, if the jury be-
lieved the testimony of the plaintiff, as they undoubt-
edly did, they might well find for the plaintiff. There
was, according to her testimony, no occasion for any in-
terference by defendants with plaintiff's relations with
her husband, and such interference not being traceable
to any just cause, it is to be attributed to a willful de-
termination to break up plaintiff's home.

We are aware, in this connection, of the presumption
that the advice of a parent to his child is made in good
faith and in the child's interest as the parent sees it.

Birchfield v. Birchfield, 29 N. M. 19, 217 P. 616. But in a case like this, where the interference is shown, and no reason or excuse for the same can be deduced from the circumstances, there is nothing to which it can be attributed except malice of the parents. 13 R. C. L. "Husband and Wife," § 525; Weber v. Weber, 116 Minn. 494, 134 N. W. 124; Cornelius v. Cornelius, 223 Mo. 1, 135 S. W. 65.

[3] 3. The defendants complain of the action of the court in permitting plaintiff to testify to the contents of the letter of the mother to the son, heretofore referred to, and to admit the deposition of her aunt to the same effect. The objection is upon the ground that the letter was not sufficiently accounted for to allow secondary evidence of its contents. Plaintiff testified that her husband showed her the letter, and that she and her aunt read it; that her husband took the letter and that she did not know what became of it, and had made no effort to get it. No demand was made to produce it, and no subpoena duces tecum issued. The husband, to whom the letter was written, was in attendance at the trial, and was sworn as a witness for the defendants, but did not testify. The mother testified she wrote no such letter. The letter was the property of the plaintiff's husband, and he was in attendance, not as a friend or partisan of the plaintiff, but as the witness and partisan of the defendants. He had once before denied the receipt of the letter when plaintiff confronted the mother with the writing of it. It was a writing which would not, in ordinary course, be preserved, as it had failed, at that time, to accomplish its purpose. At any rate, if the letter was in existence and different from plaintiff's testimony, the husband was there to produce it, and, if it was never received by him, he was there to say so. He did neither, and the defendant mother contented herself by simply denying the writing of the letter.

It may be that, according to the strict general rule, a notice to produce or a subpoena duces tecum should

have been served before secondary evidence should have been allowed; still, inasmuch as, according to the only evidence of defendants in the case, no such letter ever existed, it would seem that the error of the court was technical rather than substantial, and the defendants suffered no legal injury. If no such letter was written, of course none could be produced. In such case, the error, if there was error, becomes immaterial. See Jones on Evidence, "Civil Cases" (3d Ed.) § 224; Bickley v. Bickley, 136 Ala. 648, 34 So. 946; Boyd v. Warden, 163 Cal. 155, 124 P. 841; and other cases cited by Mr. Jones.

[4] 4. The defendants stressed the alleged fact that there was no affection between plaintiff and her husband, and therefore there was none to alienate. They put on evidence of third persons to the effect that the parties quarrelled more or less constantly as indicative of that condition. Plaintiff, in rebuttal, introduced a number of letters received by her from her husband while he was in France, showing deep affection for the plaintiff. Objection was interposed by defendants upon two grounds: The first ground was that the letters were privileged communications, and as such were incompetent. The argument is founded upon a misconception of the law. Laying aside the question as to whether the principle is applicable at all in this case, the husband not being a party to the action, it would seem clear that the doctrine is wholly misapplicable here. A spouse, at common law, was disqualified to testify for or against his spouse. This disqualification has been removed by statute. See section 2165, Code 1915. So husband and wife may now testify for or against each other, the same as if unmarried, with the exceptions to be noted. By section 2167, Code 1915, one spouse may testify for, but not against, another in a prosecution for crime. By section 2168, Code 1915, one spouse may testify against the other in prosecutions for sexual crimes, such as adultery, but may not be compelled against his will to do so. Section 2174 upon which counsel for defendants rely, provides that

neither spouse may be compelled to disclose confidential communications between them, but does not prohibit the disclosure of the same. It thus appears that the wife may testify against the husband in any case, if she so chooses, except in cases of prosecution of the husband for crime other than sexual crimes. Some of these sections were considered in U. S. v. Meyers, 14 N. M. 522, 99 P. 336.

5. A further objection to the letters is made on the ground that they are hearsay. So far as they relate to the affection existing between the plaintiff and her husband, they are clearly not hearsay. They were written at a time when the husband was in the army, and no reason existed to cause him to make a self-serving declaration, or one in favor of plaintiff, unless the statements were true. They were the expressions of the husband's feelings, as natural as anything could be. They are as competent as any other action from which the affections of a man for a woman might be inferred. That such evidence is competent for such purposes, see 13 R. C. L. "Husband and Wife." § 526; Leucht v. Leucht, 129 Ky. 700, 112 S. W. 845, 130 Am. St. Rep. 486; Fuller v. Robinson, 230 Mo. 22, 130 S. W. 343, Ann. Cas. 1912A, 938; Ash v. Prunier, 105 F. 722, 44 C. C. A. 675; Jameson v. Tully, 178 Cal. 380, 173 P. 577; Harringer v. Keenan, 117 Wash. 311, 201 P. 306; Perry v. Lovejoy, 49 Mich. 529, 14 N. W. 485. See also 3, Wigmore on Evidence (2d Ed.) § 1730, where the philosophy of the admissibility of such evidence is explained. The same is to be said of the conversation between plaintiff and her husband when he first informed her he was going to leave her. This showed the change in his affections, after the advent of the defendants in Albuquerque.

[5] 6. Objection is made to two of the letters and to some conversations between plaintiff and her husband, on account of the fact that there are contained therein references by the husband to the conduct tending or designed to alienate the husband's affections. This

presents the most serious question in the case. It requires no argument or precedent to demonstrate that the actual conduct of the defendants, in a case like this, could not be shown by allowing the plaintiff to relate what her husband told her they had done. This would be hearsay pure and simple. But such statements may be admissible for the purpose of showing the attitude of the alienated spouse toward the plaintiff from time to time as the process of destruction goes on, finally culminating in complete domestic disaster. When the acts of the defendants are otherwise shown, such statements may be admissible, it is said, to show that the alienation was the result thereof, rather than some other cause. The situation is that such evidence is admissible for one purpose and not for another in which case the remedy is to limit the effect of the evidence by proper directions to the jury. Upon this subject, see Melcher v. Melcher, 102 Neb. 790, 169 N. W. 720, 4 A. L. R. 492, and exhaustive note, where all the cases seem to be collected.

It is apparent that this class of evidence is dangerous unless it is carefully guarded by directions to the jury. The trial court in this case appreciated this, and carefully instructed the jury not to consider this evidence for the purpose of determining what the conduct of defendants really was, but only in regard to the attitude of plaintiff's husband toward her, and what might have caused the separation. This was all the court could do and was correct.

7. Further objection is made to the testimony of plaintiff in regard to a conversation with Mr. Lougee, in regard to the order of proof by plaintiff, and the exclusion of certain evidence by Mr. Hodges, but we find no error in the action of the court in this regard.

It follows from all of the foregoing that there is no error in the record, and that the judgment is correct and should be affirmed, and the cause remanded, with directions to proceed accordingly, and it is so ordered.

BICKLEY and WATSON, JJ., concur.