# WORTH v. WORTH, ET AL.

(No. 1997; June 8, 1937; 68 Pac. (2d) 881)

(Rehearing denied without Opinion on August 31, 1937)

For the defendants and appellants, there was a brief and oral argument by *C. R. Ellery* and *John C. Pickett* of Cheyenne.

490

For the plaintiff and respondent, there was a brief and oral argument by *R. R. Rose* of Casper, Wyoming.

RINER, Justice.

This case comes before this court again on direct appeal proceedings to review a judgment of the district court of Laramie County. As case No. 1881, appealed from a judgment therein by the district court of Platte County, it was by an opinion filed here October 1, 1935, (Worth v. Worth, 48 Wyo. 441, 49 Pac. (2d) 649), returned to that court for a new trial. Subsequently, upon stipulation of the parties, the venue was changed to the district court of Laramie County, where the case was retried before the court, with a jury in attendance, commencing on the 26th day of February, 1936.

In this second trial the jury again found for the plaintiff, the daughter-in-law, against the parents of her husband, Harold Worth, who are the defendants G. M. Worth and Kate Worth, returning a verdict in the sum of $7,500.00, upon which the court entered the judgment aforesaid.

The opinion heretofore rendered by this court in the case considered sundry errors of law in connection with instructions refused and rulings relating to evidence. On the new record now before us but three questions are argued and submitted for our disposition, viz.: (1) Was there substantial evidence to support the verdict of the jury; (2) Was the verdict of the jury the result of passion and prejudice; and, (3) Is the verdict and judgment excessive?

While the question of the sufficiency of the evidence was argued at length upon the previous hearing, we did not undertake to rule on that matter, although some comments were made. A brief outline simply of the facts presented then was given. Due to the nature of the questions at this time presented, it becomes necessary to review more in detail the evidence now set forth in the record and especially that in behalf of the plaintiff, Margery Worth, whose testimony and evidence a second time has received the favorable verdict of a jury.

Plaintiff and her husband were married on December 23, 1927. At that time she was teaching school and continued so to do until May 20, 1928. Her husband at the time of their marriage was working in Scottsbluff, Nebraska, and immediately thereafter was employed in the Sunrise iron mines until March 1, 1928, when at the request of the defendants, he went to work on their ranch in the vicinity of Wheatland. His parents promised him that he would receive as compensation the money necessary for living expenses and the balance in the form of an interest in livestock. Upon the close of

her school term Margery joined her husband at the ranch home of the defendants. She had theretofore objected to this arrangement as unwise, pointing out that two families thus situated frequently do not get along well, but her objections were met by the parents' suggestion that the house was large and it could be divided so that the young folks would have their own apartment. The suggested plan was not carried out, however, until June, 1929.

Harold and his wife subsequent to their arrival at the ranch and for nearly a year thereafter, therefore, lived with the defendants as one family. There do not appear to have been any difficulties until the fall of the year 1928, when the defendants began to complain nearly every day of plaintiff not doing the work, she undertaking then to perform practically all the housework, cooking and taking care of the poultry. At this time but one hired man was employed on the ranch, although there were occasions when more were employed. When these criticisms were directed at the young wife she had become pregnant, and about half the time, as she says, it was very hard for her to do the work and she was ill frequently. She continued, however, to carry on the housework until about a week before the child was born. During this period continued and additional criticism seems to have been directed against Margery by both Mr. and Mrs. Worth, in the presence of their son Harold, reflecting on plaintiff's family, to the effect that she had not come from a very good family, that they had nothing in a financial way and did not amount to much.

The expectant mother planned a layette for the child and made a list of the things she would need. Mrs. Kate Worth watched Margery prepare the list and afterwards had a conversation with Harold in an adjoining room, overheard by the latter's wife, in which Harold's mother complained of the list as too expen-

sive. The amount to be expended had theretofore been agreed upon between the young folks as the sum of $10.00. After talking with his mother, Harold immediately returned to his wife, and, pursuant to the mother's directions, told the wife that she was buying too extravagantly and getting a lot of things that she did not need, asking her, with some profanity, if she did not intend to do any washing. The young husband at this time appears to have reflected the criticisms of his wife suggested by his parents, as he told her that she was lazy, that she had no interest in her home or in him, and that all she thought of was parties and wanting to play bridge. She never played bridge after she was married, as she testified.

The child was born at the hospital in Wheatland, Wyoming, on March 15, 1929, and lived but eighteen days. A few days before the child died, while Margery was in bed, under the care of the physician in attendance and was, as she testified, "paralyzed," a condition known to Mrs. Kate Worth, she overheard a conversation between Harold and his mother just outside her door in the hospital, in which Mrs. Worth told Harold that Margery had been in the hospital long enough, that she was not trying to help herself or trying to get up, that she could get up if she wanted to, and that she was just running up a bill. Up to that time the son had made no complaint of the situation, but immediately thereafter, he came into his wife's room, and in angry tones told her that he thought she had been there long enough and that she should try to get up and get out as quickly as possible. At the time this conversation occurred the wife had been unable to sit up, and she remained in the hospital for five weeks, under the daily care of the attending physician. Upon Margery's return to the ranch she was still unable to walk. At this time Mr. G. M. Worth said to Margery in Harold's presence that there would not be any work done on the

place if Mrs. Kate Worth became ill and was not able to do it. This was just a few days after Margery had returned from the hospital.

In June or July of 1929 Harold and his wife moved into a part of the ranch house which had been separated for their use and where they had expected to go upon their first arrival at the ranch. On one occasion during the summer of 1929 Harold was absent over Sunday, and that afternoon being extremely warm, Margery went in bathing with friends of the Worth family. They had taken their bathing suits with them, Mr. G. M. Worth had seen them go, and at the time made no objection. Mr. G. M. Worth, as well as a number of the residents of the neighborhood, went also at the time to bathe in the same lake where the young folks had gone. When Margery returned Mrs. Kate Worth declined to speak to her, and shortly afterwards Mr. G. M. Worth came in and accused her of "terrible disgraceful conduct" in going swimming without her husband being present. Mr. G. M. Worth also told her at that time that he would not be surprised at her doing so because she was not a decent person and never had been. Shortly afterwards Mrs. Kate Worth entered the apartment and she reiterated the accusations of her husband.

Upon Harold's return, his wife told him what had occurred, and he stated that he did not disapprove of her conduct and that he was glad she had gone and had a good time. While the young people were discussing the incident, Mr. G. M. Worth at his own request entered the apartment, listened to what was being said and immediately denied that he had made any such statements. The conclusion of the conversation at this time was that Harold's father told Margery that she could not get along there at the ranch, that she was not trying to, that she had disgraced the family, and that Harold would be better off without her and all he could

do was to put her on the train and send her home. Mrs. Kate Worth came in at this time and joined in the conversation. Harold at first insisted that he could get along with Margery and that he was not going to let their home be broken up and that he would not let her leave. On this occasion also, Margery suggested that it would be best that she and Harold go away and make a home for themselves, to which Mr. G. M. Worth responded that Harold could not leave the ranch, that no young man twenty-six years old could get along without his father. Mrs. Kate Worth stressed the fact in her conversation at the time that Margery was indecent, that she disapproved of Margery's dancing and that Margery could not get along with Harold and that there was no use of them trying to go on.

The next day after this incident Margery took some work into the apartment of Harold's parents, with the idea of visiting with Mrs. Worth and doing what she could to heal the breach. However, the elder woman told her to go to her own apartment and stay there. After this incident neither Mr. G. M. Worth nor Kate Worth came into the apartment of the young folks or spoke to Margery, except on a few occasions. Subsequent to this difficulty Harold again repeated the criticism of his parents to his wife and told her that her family was not any good and that she was not trying to make a home or trying to help him.

Shortly after this trouble, too, on one occasion Harold left the field where his father and he were working and came and spoke to his wife, who was mailing a letter. At that time he told her that things were not going along so well and he guessed all he could do was to put her on the train and send her home. A day or so later Margery left the ranch for her home with her parents in Nebraska. She told her husband that she would not return to the ranch and both agreed that they could not live there peaceably. Harold told her

when she left that she was not to blame for the things that had occurred. During Margery's absence her letters to her husband were, at Harold's suggestion, sent by his wife to a neighboring ranch in care of mutual friends. Harold assured her that he would not ask her to come back until he had another place where they could live other than at the ranch of his parents.

Margery was absent for two weeks at her parents' home, but upon receiving a letter from Harold that he had arranged for another place for them to live, she returned and upon her arrival learned that Harold had been advised not to take the place he wanted, and that instead they were going to live on a homestead which adjoined his father's ranch and that he was to continue to do work for his father. The young folks moved upon the homestead property about the first of October, 1929, staying there just a month, living in just a shack, a very small building and roughly built. During that time they got along satisfactorily, except when discussing Harold's parents. Inclement weather drove them from this location, and Harold decided that they should go to another house, called the "Ditch house," which was located quite a distance from his parents' home, where they could be by themselves. However, when Harold returned from work at noon that day he said that they should go back to the ranch home of the parents, that his mother had suggested that they come back there. Margery protested about returning to the Worth ranch, but nevertheless did so. She remained there from the 1st of November, 1929, to the 11th of February, 1930. The parents-in-law during this period never spoke to Harold's wife or came into the apartment except on one occasion, presently to be mentioned.

From the time the young people returned to the ranch until February 11th the elder Worths kept Harold with them and away from his wife a great deal. After almost every meal, and sometimes before he had

finished, they would call him and he would go into their part of the house, and if it were after supper, spend the evening there. When he returned on these occasions, he frequently was angry and upbraided his wife for things she did or did not do, accused her of not doing her work, not being interested in the place and the work there, and that she was not satisfied and was not trying to get along. Notwithstanding she never expressed any dissatisfaction with ranch life.

On one occasion during this period, although Harold and his wife owned one of the three milk cows and the milk from the three cows was kept together, Mrs. Worth complained about Margery using too much cream. Learning of this from her husband she returned the cream that she had taken at the time the criticism was made and thereafter went without, while Harold was supplied with a pitcher of cream each morning for his use.

On another occasion, in the early part of February, 1930, Harold and his wife were expecting some friends, who had some small children, and Margery took to the storeroom a number of things which she thought the children of the friends might injure or disturb, and among them there was a picture of the defendant, G. M. Worth. A day or so later Mrs. Kate Worth, while Margery was preparing dinner, came to the kitchen door of the young folks' apartment and asked Margery why she had thrown Mr. Worth's picture into that storeroom and inquired if it had been done as an insult to him, Mrs. Kate Worth saying that she had found it among Margery's things in the storeroom; whereupon Margery inquired as to why Mrs. Kate Worth was "rummaging in my things." The older woman immediately became violently angry and came into the room and slapped Margery, called her vile names and again commented on her being indecent, that her family did not amount to anything and that they were just a wan-

dering tribe of Indians. Margery requested her to leave the kitchen, saying that she did not care to talk about it; whereupon Mrs. Kate Worth told her that she did not have to get out, that it was her house and slapped her again. Margery replied that if that were the way it was, that she did not have any privacy in her own kitchen, she would leave, and Mrs. Kate Worth told her to get out and be out by the next morning.

The elder Mrs. Worth then retired to her own rooms, and Margery began gathering her things together, preparing to leave. Harold came in and she told him what had taken place and that she was going to leave. Harold then went in to talk to his mother about the matter. However, Margery called to her husband and asked him to come back and not to quarrel with her about it, as it was definitely settled that she had to leave. The elder Mrs. Worth followed her son back into the room where the young woman was, seized hold of her, and to quote the record: "She choked me, and tore my dress nearly off of me, and Harold pulled her off of me finally —it took all the strength he had to do it—and she was violently angry, and she picked up everything that she could get hold of and threw at me, and I had baked bread that morning, and I had a box of bread setting on the table, and she threw that at me, and she threw the clock at me, and finally she picked up a chair and started at me with that, and Harold got it away from her, and he called his father in—his father had seen her choke me, he was standing in the next room. She told Harold at that time that she didn't see why he ever married me, and that I married him for his money, that was all I married him for, and I didn't care anything about him."

Mr. G. M. Worth was within hearing and in the next room, and upon Harold's request came in to help him control the angry woman. Harold's father patted Mrs. Worth on the arm and said: "Now, Kate, I think you

have done enough." Mr. Worth then turned to Margery and told her to get her "things and get on out. He said, 'Why don't you go?' " Margery told both the defendants that she would try to get out as quickly as she could, as soon as she could get her things together. Whereupon Mrs. Kate Worth picked up a lot of them and took them to the door and threw them out in the snow. Mr. G. M. Worth was present at this time. Harold and Margery then took the rest of her things, just as they were, not waiting to pack anything. They took the things which had been thrown in the snow and the other things and piled them in a box and put them in Margery's trunk, and the young wife was taken to Wheatland by her husband. This occurrence took place on February 11, 1930. On the way to town Harold told Margery that he would never ask her to return to the ranch again, that he himself could not leave at that time because he and his father were feeding cattle. Accordingly Margery returned to her parents' home in Nebraska, where she remained until the 14th of May, 1930.

During her absence she corresponded with Harold, sending the letters to him as before. He at first wrote frequently, but the letters as time went on became less frequent. In response to Margery's inquiry Harold fiinally wrote that he had a place, referred to in the record as the "Salliday place," where they could stay. Harold, however, did not send for her, but finally she sent him a telegram saying that she was coming. In response Harold wired back and told her not to come until he sent word, but she came anyway. Harold did not meet her upon her arrival. Ultimately they went to the Salliday place to live. Margery found that Harold had changed considerably and that he did not seem particularly interested in making a home there or staying there at all. He spent most of his time at his father's ranch. Occasionally Harold and Margery went

to the town of Wheatland, and when they met his parents on the streets of the town, the parents would stop and talk with Harold, without speaking to her. On other occasions she met Harold with his parents, but they would not recognize her and at times Harold would not either. On those occasions the elder Worths never spoke to Margery.

In the fall of that year Margery began teaching at a rural school in the vicinity of the Salliday ranch—in September, 1930,—and continued to do so until the first of November. She and Harold lived at the Salliday ranch until the first of October, when Harold told her that he was going to another ranch to work in the beet harvest, and suggested that Margery get a place to board in the neighborhood of the school she was teaching. Another child was expected by this time. Harold nevertheless went away, telling her he was going to this other ranch, known as the "Sorensen place," to work. He did not once come to see his wife from the first of October until the first of November. Sometimes she met him in town, and on one occasion she met him accidently at the home of her aunt in Dwyer, where she found him campaigning with his father, who was then a candidate for the State Legislature.

Margery was finally obliged to discontinue her teaching, and inquired of her husband concerning arrangements for a place to live until the arrival of the child which was expected the following March. She expressed a desire to remain in Wheatland or its vicinity, but Harold told her that he was going to be at his father's ranch for a while and then he was going with his uncle to work on his grandfather's place, and that she would have to go back to Nebraska with her parents and stay there until after the birth of the child. Margery accordingly returned to Nebraska the latter part of November, 1930.

Margery came back to Wheatland on the 29th of

December following, having received a letter from a friend advising that if she wished to keep her home she would do well to return. Going to the post office she found letters written to Harold by another woman indicating illicit relations. Margery then filed a criminal complaint for desertion and an action for separate maintenance against her husband. She also made efforts to find her husband, and after some time finally located him, although when she and her sister and another woman drove out to the Worth ranch for that purpose and were told by Mrs. Kate Worth that he was not there, upon returning to Wheatland they met Mr. G. M. Worth, who when informed that his wife had said that Harold was in town with him, remarked, "Then somebody lied." Margery's sister at this time talked with Mr. G. M. Worth and suggested that it would be best for Margery and Harold to go away, that they could do anything, that Margery could teach and Harold could even dig ditches if it were necessary to make a living. Mr. Worth remarked that Harold could not do manual labor.

Shortly afterwards Harold and his father and Margery and her sister had a conversation about the existing situation. Margery urged Harold to go away and told Mr. G. M. Worth that was what she felt they should do. To this suggestion Harold made no response, but Mr. Worth said "that Harold could not leave the ranch, that all he could do was ranch work and that he could not leave his father, and that he had to stay there and work." When Mr. G. M. Worth was informed of Margery's condition he "was not at all concerned," and said that "no woman that was away from her husband as long as" she "had been away from Harold could expect him to remain a husband to her." Mr. Worth just insisted "that Harold had to remain with him, that he could not go away and that" Margery "could go back to Nebraska, that that was the

thing for" her "to do because" she "could not remain there."

Later, about the first of January, 1931, Harold and Margery talked together by themselves about going away and making a home for the expected child, and Harold agreed that that should be done and that they should leave the community. Shortly afterwards Harold returned to the ranch of his parents and when he came back to the hotel room where his wife was staying, he told her that she would have to go home to Nebraska, that there was nothing else to do and that she would just have to go and when did she want to leave. Thereafter Harold, together with his brother and the latter's wife, brought Margery to Cheyenne, and arrangements were made in that city for her approaching confinement. He told her that he was coming down to Cheyenne to work and if she would come to Cheyenne he could be with her during the period of her confinement. However, after arriving in Cheyenne she was told by her husband that he was unable to get a job there and so could not be with her, but he would be at the Worth ranch. A few days later she returned to Wheatland and found Harold eating lunch with the woman who had written him the letters which Margery obtained at the post office, as above mentioned. Harold soon afterwards disappeared and his whereabouts seem subsequently to have been unknown for he did not testify at either the first trial or the second.

The testimony of the defendants in large measure conflicted with that of the plaintiff so far as their attitude towards her or criticisms of her and endeavors to prevent her living at the ranch and with their son were concerned. For example, their version of the trouble in connection with the picture, as related by Margery and recited above, was that on that occasion Mr. Worth came home and found his wife "standing in the middle of the room, and she said she believed the

kids were having some trouble" in their apartment; that they could hear glass breaking and quite a bit of commotion there; that he went in and there was a big window broken out and the glass door was broken out of the music cabinet and things thrown around in general; that he told them if that was the best they could do they had better get in a house of their own where they could fight it out among themselves.

On cross-examination Mr. G. M. Worth testified that he knew of nothing that would lead him to think that Margery had ever done anything immoral or indecent and that he had never charged her with being so. Mrs. Kate Worth on direct examination stated that she never called Margery "lazy" and that she did not think she was, and that she liked her very much.

A sister of Mrs. Kate Worth testified on behalf of the plaintiff. She stated that she visited at the Worth ranch shortly after February 11th, 1930, when the trouble occurred about the picture, as already related; that Mrs. Kate Worth told her she had choked Margery and that "she would have killed her if Harold had not come in, or she might have killed her if Harold had not come in"; and also that Mr. and Mrs. Worth frequently referred to Margery in the sister's presence using vile names regarding her, as they did concerning those they regarded as their enemies.

The foregoing, while it does not undertake to supply an exhaustive review of the evidence in the plaintiff's case, would seem to present most of the matters so far as a printed record can disclose them upon which the jury reached the conclusion it did.

Except in those jurisdictions where by statute actions of this nature may not be brought, parents are generally held liable for any wrongful alienation of the affections had by their married children toward their husbands or wives. 13 R. C. L. 1471; 30 C. J. 1129; and cases cited. As may be readily gleaned from what

was stated in the previous opinion relating to this case, parents when actuated by a sincere desire to promote the happiness and welfare of their offspring "may advise them in good faith as to their domestic affairs without becoming liable as for an alienation." 30 C. J. 1130. It is highly proper that this should be the rule affecting parents in such case from the very nature of their relationship and the deep interest ordinarily displayed by them for the true well-being of their children. Uniting these two rules it follows that to act within their privilege the parents' cause or excuse for interference in the relations of their married offspring must be just, and "if the parent is guilty of such conduct as tends to cause the separation of the husband from the wife, so as to be without just cause or excuse so that malice is inferred, it breaks down the barrier of privilege so as to create a cause of action against the parent. Barton v. Barton, 119 Mo. App. 507, 94 S. W. 574; Nichols v. Nichols, 147 Mo. 387, 48 S. W. 947." Porter v. Porter, (Mo. App.) 258 S. W. 76. It has been said that the malice necessary to be proven against parents to remove them from the protection of the rule aforesaid is the same in meaning as "improper motives." 13 R. C. L. 1471. After stating that express malice need not be proved, in Woodhouse v. Woodhouse, 99 Vt. 91, 130 Atl. 758, the Supreme Court of Vermont remarks:

"Malice in the sense used in actions of this kind implies no more than the intentional doing of a wrongful act without just cause or excuse. Direct evidence of the parents' wrongful motives is not required, but malice may be inferred from conduct, as in other cases where it is in issue. Cornelius v. Cornelius, 233 Mo. 1, 135 S. W. 65; 13 R. C. L. 1474; note Ann. Cas. 1912C, 1180; note Ann. Cas. 1917E, 1017. It may be inferred from wrongful and unjustifiable conduct which causes alienation. Clark v.

Clark, 187 Ind. 25, 118 N. E. 123; Westlake v. Westlake, 34 Ohio St. 621, 32 Am. Rep. 397; 30 C. J. 1122, 1136."

Similarly in Wallace v. Wallace, 85 Mont. 492, 279 Pac. 374, it is said:

"In such a case the plaintiff must show that the defendant acted with malice toward the plaintiff (Bourne v. Bourne, 43 Cal. App. 516, 185 P. 489; Tucker v. Tucker, 74 Miss. 93, 19 So. 955, 32 L. R. A. 623; Cooper v. Cooper, 102 Kan. 378, 171 P. 5); but this proof need not be direct—it may be implied or deduced from the facts and circumstances related (Hutcheson v. Peck, 5 Johns. (N. Y.) 196; Warren v. Graham, 174 Iowa 162, 156 N. W. 323; Moir v. Moir, 181 Iowa 1005, 165 N. W. 225; McAllister v. McAllister, 72 Colo. 28, 209 P. 788; Biggs v. Biggs, 78 Colo. 310, 241 P. 539), and the 'malice' here requisite need not spring from a mean, hateful, or revengeful disposition, but may imply conduct injurious to another, though proceeding from an ill-regulated mind not sufficiently cautious before it occasions the injury. Roberts v. Cohen, 104 Or. 177, 206 P. 293.

"It is not necessary that there should have been any spite or hatred on the part of the defendant toward the plaintiff, or bad feeling existing in order to constitute malice within the meaning of the decisions on this question, but any wrongful act done intentionally, tending to injure, and done without just cause or excuse, is malicious." (Citing authorities.)

See also Jones v. Jones, 96 Wash. 172, 164 Pac. 757; Thomas v. Lang, 135 Wash. 675, 238 Pac. 626; Clark v. Clark, 187 Ind. 25, 118 N. E. 123.

It was observed in our former opinion also that the gist of the action is the loss of consortium by the plaintiff. Such a loss as it concerns the wife involves both the personal society, affection and companionship of the husband for herself and their children and the correlative financial right to be maintained and supported during his life as appropriate to his rank and station. Nelson v. Nelson, 296 Fed. (C. C.

A. 2d Cir.) 369. That a liability on the part of the defendants must be predicated upon conduct on their part which constituted the controlling cause of the alienation of the plaintiff's husband's affections was likewise ruled in what we heretofore said regarding this case. The same principle was elaborated in Woodhouse v. Woodhouse, supra, thus:

"It is not necessary to confer a right of action for alienation of affections that the defendants' conduct be the sole cause of the alienation or separation. It is sufficient if it is the controlling cause. Baird v. Carle, 157 Wis. 565, 147 N. W. 834; Hughes v. Holman, 110 Or. 415, 223 P. 730, 31 A. L. R. 1108; Rush v. Buckles, 93 W. Va. 493, 117 S. E. 130; McLery v. McLery, 186 Wis. 137, 202 N. W. 156."

And the Supreme Court of Iowa said in Warren v. Graham, 174 Iowa 162, 156 N. W. 323:

"It was not necessary for plaintiff to show that defendant's conduct was the sole cause of her loss; it was enough that it was the controlling cause without which her husband would not have left her. Rice v. Rice, 104 Mich. 371, 62 N. W. 833; Nevins v. Nevins, 68 Kan. 410, 75 Pac. 492; Plourd v. Jarvis, 99 Me. 161, 58 Atl. 774."

See also 30 C. J. 1125, Section 982 and cases cited.

It must be evident from an examination of the reported decisions that each case of this character possesses its own peculiar group of facts and necessarily each must in large measure, so far as the decision rests upon those facts, be determined by itself. However, guideposts are to some extent supplied by the courts in their more or less extensive reviews of the evidence submitted to juries in this type of litigation and upon which they conclude the fact-finding body may or may not act. We may here properly perhaps refer to a few.

In Woodhouse v. Woodhouse, supra, the court said

in the course of its review of the evidence in that case:

"Defendants' actions ever after they learned of Douglas' engagement to the plaintiff were so wholly inconsistent with their professions of regard at the trial that the jury would be justified in discrediting their testimony. They advance no reason for the separation except Douglas' infatuation for Mrs. Mac-Clelland; but the evidence shows that the alienation of his affections for the plaintiff had substantially been accomplished before he became acquainted with the MacClelland woman. Considering that the evidence showed the plaintiff and her husband were happy in each other's company when left to themselves, even to a time near their separation, it is a potent circumstance that no other probable cause than the influence of the defendants is disclosed for Douglas' progressive change of attitude toward the plaintiff ever after they learned of his proposed marriage. Their conduct thereafter toward the plaintiff was most unnatural on any theory advanced in defense, but, on the contrary, was consistent with their expressions of dislike for her shown by the evidence. The circumstances would justify an inference of malice and a deliberate plan to bring about the result finally accomplished. These facts, if found to exist, would so characterize the other evidence as to clearly make the question of liability one of fact for the jury. * * *

"It is urged that plaintiff failed to establish the actionable consequences of the conduct complained of, in that the case does not show that the loss of consortium was due to the defendants' acts, but does show that it was due to her own acts, induced by Douglas' conduct with Mrs. MacClelland. There can be no question that loss of consortium was fully established. The real question then relates to causal connection. It is argued that the loss of consortium arose from plaintiff's choice; that she could not, by her conduct in refusing to continue the marital relations, supply the otherwise missing element. The argument on this ground of the motion loses sight of the basis of plaintiff's right of recovery, as well as the evidence that connects the defendants therewith.

The gist of the action is the loss of consortium of the husband. Jenness v. Simpson, 84 Vt. 127, 78 A. 886. This includes his affection, his conjugal society, his aid and cooperation in every conjugal relation. It is not essential to the maintenance of the action that there should be any loss of service or any pecuniary loss whatever. Nor is the actionable character of the injury dependent upon separation or the physical absence of the husband. The wrong could be inflicted though the plaintiff was living with her husband at the time." (Citing many cases.) .

In Clark v. Clark, supra, the court said:

"It also appears from declarations of both of the appellants that they had the inclination and disposition of mind to alienate the affections of their son from appellee and to take him from her and keep him. Nothing could have been better calculated to destroy the respect and the love of the son for his wife than the disrespectful treatment which she received at their hands and the disparaging language and the vile and humiliating accusations which they addressed to her in his presence. Appellee's husband was quite young at the time, and there is evidence of statements and conduct on his part tending to show that his mind was very subservient to the influence of his parents. The evidence shows declarations and conduct on the part of both of appellants indicating that they entertained ill feeling and malice toward appellee; besides, malice may be inferred from wrongful and unjustifiable acts and conduct. 13 R. C. L. p. 1471; Brown v. Brown (1899) 124 N. C. 19, 32 S. E. 320, 70 Am. St. Rep. 574. * * *

"This court is of the opinion that there is some evidence to sustain the verdict."

A judgment for the plaintiff was affirmed.

The conclusions of the court in Nevins v. Nevins, 68 Kan. 410, 75 Pac. 492, relative to the evidence in that case are contained in this language:

"To sustain the verdict, it is unnecessary to attempt a detailed statement of the acts of the defendant. It is sufficiently shown that he had and exercised a

dominating influence over his son, and that he had determined to effect a separation of the young people, with or without justification. The son hesitated in believing the imputations made by his father against the conduct and character of his wife, sometimes protesting and sometimes crying, but he appeared to lack the manliness and courage to resent them or to protect her. He weakly yielded to the aggressive conduct of his father, who compelled him to put his young wife in a wagon and take her to her parents, and to be sure that there was no change of purpose or turning back he accompanied them, ordered her out of the wagon at her mother's home, and in a cruel and abusive manner charged that she had been guilty of gross wrongs and offenses. It is but fair to the defendant to say that he denied many of the things attributed to him, but the testimony of the plaintiff below was accepted by the jury, and is sufficient to support the verdict. From the testimony Ella appeared to be very much attached to her husband, and there was no attempt to prove her guilty of any of the things with which her father-in-law had charged her."

In Surbeck v. Surbeck, (Mo. App.) 208 S. W. 645, a judgment in favor of the plaintiff, in the sum of $6000.00, was affirmed against the mother and brother of her husband for alienation of the latter's affections. Discussing the situation presented by that record these views were expressed:

"Was there evidence from which the jury could find that defendants sought to separate them? Unquestionably, if plaintiff was treated by them in the way disclosed by the record, the natural, reasonable, and ordinary consequences would be to drive the young wife away, and, in that event, if her husband did not want to leave the home of his boyhood and youth, the inevitable result would be to separate them. The evidence is that John did not want to go away from defendants and the farm neither then or after he had later promised his wife at La Plata that he would and that he would provide a home elsewhere. The first time the question of leaving the

homestead became acute, it was suggested that they go to the little house on the farm. To this the young wife agreed, and permission of the elder Mrs. Surbeck was asked. It is said that her consent and the fixing up of the house show that she was not trying to separate them, but was trying to keep them together. But it does not conclusively show this. According to plaintiff's evidence, this agreement to fix up the little house was accompanied with the statement by Mrs. Surbeck that she would see they did not live very happy. We are not authorized to say that plaintiff's evidence on this point is so unreasonable or so contrary to the common experience of mankind that it is not to be believed. It was for the jury to weigh and pass upon. Besides, there is evidence from which the jury could infer that, rather than that John should go from the farm, the agreement to fix the house was made. Defendants' own evidence shows that after the father's death they were anxious to keep John on the farm, and the jury could rightfully draw the inference from this and other evidence in the case that such was the real motive in fixing up the little house, and that it did not interfere with the intention that the separation desired was that the young wife should depart, leaving John upon the farm, where defendants wanted him. If plaintiff's evidence is true—and we must accept it as true in view of the verdict—the subsequent conduct of the defendants, and especially that of Mrs. Surbeck, in keeping John at her house and away from his wife, affords ground from which the jury might reasonably draw that conclusion."

We may additionally cite in this connection as of assistance in the examination of the sufficiency of the evidence now before us, Smith v. Smith, 192 Mich. 566, 159 N. W. 349; Lanigan v. Lanigan, 222 Mass. 198, 110 N. E. 285; Biggs v. Biggs, 78 Colo. 310, 241 Pac. 539; Renner v. Renner, 5 N. J. Misc. 411, 136 Atl. 707; Nelson v. Nelson, supra; Murray v. Murray, 30 N. M. 557, 240 Pac. 303; Shalit v. Shalit, 126 Me. 291, 138 Atl. 70; Nichols v. Nichols, 147 Mo. 387, 48 S. W. 947.

It is unnecessary to refer to the rule governing this court on review of a jury's verdict, acquiesced in by the trial judge, upon conflicting evidence. Counsel are quite familiar with it. This court has repeatedly said:

"Where an appellate court is empowered to reverse upon the facts, it can never reverse on them simply because upon the evidence, as submitted to it, it would have arrived at a different conclusion; and can only reverse when the verdict, or if the trial was by the court without a jury, the findings were so clearly against the weight of evidence that no mind of fair intelligence and faithfully exercised can be reasonably supposed to have arrived at the result which is complained of; or to state the rule in a different form, but as conveying the same idea, tends to an opposite conclusion; which is to say, reducing the rule to a brevity, where the evidence is all one way and the verdict or findings another."

Marshall v. Rugg, 6 Wyo. 270, 44 Pac. 700, 33 L. R. A. 679; Worland v. Davis, 31 Wyo. 108, 223 Pac. 227. So the Supreme Court of Iowa remarked in a case of the nature we are considering, Stilwell v. Stilwell, 186 Iowa 177, 172 N. W. 177:

"When the jury is properly charged as to what is requisite proof, and returns a verdict for the party having the burden of proof, we do not try as a question of fact whether the proof is of the required strength. In determining whether there was a case for a jury, we cannot interfere with the finding of the jury because we are of opinion that were we sitting as jurors we would have held that the proof was not as strong as was required. In the case at bar, all we may inquire into is whether we can say, as matter of law, that the proof adduced was insufficient. The jury has found that the essentials to a verdict have been sufficiently established. We can interfere only if we may say that no reasonable mind could so find. It is not a question of what we think of the evidence. The narrow question before us is whether a jury could in reason find that the matters we have referred

to as being necessary elements in the proof have been established. We have already said that as a guide to appellate review fact cases are of little help. In the last analysis, the question here is whether, as matter of law, the evidence in this very case is insufficient to sustain a recovery."

With the foregoing authorities and plaintiff's evidence in mind we are obliged to conclude that the jury could reasonably find that the defendants insisted upon their son remaining with them at their ranch home, so that he could aid with the work on the place and that they rendered it impossible for plaintiff to live there; the jury could find that when the young couple lived in the vicinity, even, of the parents' ranch, they held such dominion and control over him, and by repeated criticism of the plaintiff and her family, at length, implanted in his mind the idea that he could not live with her at all, though he at first insisted that he could; the jury could find that every effort on the part of plaintiff to induce her husband to go elsewhere for the purpose of establishing a home for them away from the unfortunate influence of the parents was blocked by the latter; it could be found that the son Harold was weak and vacillating in character, and that the continued disapproval, criticism and harsh conduct of his parents toward his wife over a long period of time eventually had its disastrous effects upon his affections for his wife. In short, the jury could reasonably find that the defendants did wrongfully alienate the affections of plaintiff's husband from the woman he had promised to love and cherish; that their acts in the course of their relations with their son and wife were such that it could be fairly inferred that they were actuated by malice, within the rule above referred to; and that their conduct in the premises was really the controlling cause of such alienation, though perhaps not the sole cause thereof.

It is true that the actual separation of the plaintiff and her husband was at the last in part brought about by the repeated deceptions practiced upon plaintiff by her husband and by his illicit relations with another woman, but as the evidence is now presented to us, we think the jury might properly conclude if they saw fit, and as they no doubt did, that Harold's affections were alienated from Margery by the actions of his parents before Mary Lee Arnold appeared as a factor in the matter. It may not be amiss to remark that it is common knowledge that a broken home life has many times driven one or the other of the spouses to seek illicit relations with others.

So far as the point urged that the jury was induced to render its verdict through passion or prejudice is concerned, very little need be said. The record is devoid of anything that would justly lead us to think so. We cannot overlook that two juries have reached similar conclusions upon the facts presented to them. One of these fact-finding bodies was drawn from the county wherein all the parties to this litigation had lived for years; the other from a county where they were strangers. Their verdicts upon the matters they were required by law to decide, in due course received the approval of two experienced trial judges. We do not conceive it to be within our province to interfere with the final result under such circumstances on a record free from all asserted error both in the reception of evidence and in the charge to the jury unless we were were convinced that there was merit in any one of the three points urged for appellants and now being considered.

Relative to the contention that the verdict is excessive, we are obliged to say that it cannot be upheld. An examination of the cases cited in this opinion, as well as many others dealing with the point, makes it clear to us that we should not disturb the judgment on that

ground. See also 30 C. J. 1153, Note 83, and cases there cited; 66 A. L. R. 609, Note. The plaintiff has for the years to come lost the consortium of her husband, with all that it implies. Their child has lost a father's care and protection. Since his abandonment of his wife she has been compelled to support herself and the child by teaching; and she has suffered mentally and physically in consequence of the unfortunate situation disclosed by the evidence before us. We cannot say that the result reached on the last trial was not the result of an honest exercise of judgment on the part of the jury. Hall Oil Company v. Barquin, 33 Wyo. 92, 237 Pac. 255, 275. On the former trial the sum of $10,000 was awarded the plaintiff by the jury, as will be recalled. In Eagan v. O'Malley, 45 Wyo. 505, 21 Pac. (2d) 821, it was pointed out that it was proper for us to consider a previous verdict in the case on a review of a retrial thereof in the light both of the record evidence and other verdicts given in somewhat similar cases. We have endeavored carefully to do so here and our conclusion is as announced above.

Finding no reversible error, the judgment of the district court of Laramie County will accordingly be affirmed.

*Affirmed.*

KIMBALL, J., concurs. BLUME, Ch. J., concurs in the disposition of the case as to the defendant Kate Worth but dissents as to its affirmance against the defendant G. M. Worth.