# CHARLESTON.

## J. P. RUSH v. J. WILLIAM BUCKLES.

### Submitted March 28, 1923.    Decided April 3, 1923.

1. HUSBAND AND WIFE—*Stranger, Interfering and Preventing Resumption of Marital Relations, Liable in Suit for Alienations of Wife's Affections; Damages, Recoverable for Partial Alienation of Wife's Affections.*

   Where there has been a separation of husband and wife for causes attributable to the husband, and the husband is seek- a restoration of his wife's affections and resumption of the marital relations, a stranger who interferes with such efforts for the purpose of preventing reconciliation and does prevent it, is liable to the husband for damages in a suit for alienation. Damages in such cases may be recovered for partial alienation of the wife's affections.  (p. 502).

2. SAME—*Burden on Plaintiff to Prove Defendant Prevented Resumption of Marital Relations in Suit for Alienation of Wife's Affections.*

   The burden in such cases is upon plaintiff to prove to the satisfaction of the jury that a reconciliation and resumption of marital relations might have been effected; and that defendant's actions were, at least, a part of, the efficient cause which prevented it.  (p. 503).

3. SAME—*Whether Defendant in Suit for Alienation of Wife's Affections Prevented Reconciliation After Abandonment Held for Jury.*

   Where the wife has lost all affection for the husband for justifiable causes attributable to him and has separated from him with the declaration that she would never again live with him, it is a question for the jury to determine, in a suit for alienation of her affections, whether her subsequent acts and declarations showed a return of her affections for him or evidenced a chance of reconciliation; and whether the acts and attentions of the defendant prevented a return of affection, or reconciliation.  (p. 503).

4. APPEAL AND ERROR—NEW TRIAL—*Verdict Should not be Set Aside, Where Evidence Conflicting on Controlling Issue, Because Judge, if Juror, Would Have Found Different Verdict; Order Setting Aside Verdict not Disturbed, Unless Judge Invaded Province of Jury.*

   A verdict should not be set aside and a new trial awarded where there is conflicting evidence on the controlling issue,

on the ground that the verdict is contrary to the evidence, because the judge, if a juror, would have found a different verdict. Where a verdict in such case has been set aside, the judgment of the trial court in so doing is accorded peculiar weight by the appellate court, and his action will not be disturbed unless upon a careful inspection of the evidence it is clear that the trial judge has invaded the province of the jury. (p. 504).

Appeal from Circuit Court, Jefferson County.

Action by J. P. Rush against J. William Buckles. From an order setting aside a verdict for defendant and awarding a new trial, defendant appeals.

*Reversed, verdict reinstated, and judgment rendered.*

*Luttrel & Rodgers,* for plaintiff in error.
*Walker, Kilmer & Byrer,* for defendant in error.

LIVELY, JUDGE:

The circuit court set aside a verdict in favor of defendant below, plaintiff in error, and awarded a new trial; and from that order this writ of error is prosecuted.

The declaration is in trespass and is by J. P. Rush against J. W. Buckles for damages in the sum of $20,000 for alienation, or, as the brief says, for partial alienation, of the affections of his wife Ellen Rush.

The errors assigned are: (1) refusal of the court to quash the affidavit for an attachment levied on defendant's property; (2) setting aside the verdict in defendant's favor and awarding a new trial.

To meet the assignments of error, plaintiff, Rush, says: (a) that the affidavit is sufficient, and (b) that even if it was not good, the order refusing to quash it was entered more than eight months before this writ of error was issued, and being final cannot now be reviewed; and as to point of error (2) that the verdict was plainly contrary to the law and evidence.

In view of our conclusions and disposition of the case, it will be unnecessary to pass upon the sufficiency of the affidavit of attachment or whether the order refusing to quash it can be reviewed on this writ.

Was the verdict contrary to the law and the evidence? What are the facts as shown by the evidence? Then, what are the principles of law governing the rights of the parties under the proof? These are the propositions we are called upon to decide.

First, what does the evidence disclose? We do not find that counsel has made a condensed recital of the evidence in narrative form so as to present the substance clearly and concisely, as required by the rule, when the sufficiency or insufficiency of the evidence to sustain the verdict is relied upon. No finger has pointed out the wheat in the chaff. The duties of this court are numerous and exacting, requiring intensive work day and night including holidays. Thousands of pages are often contained in one record; and if counsel would familiarize themselves with the rules and adhere to them in the presentation of their cases, the arduous labors of the court would be lightened, and weary midnight hours shortened.

The wife, whose affections for her husband are claimed by him to have been partially alienated by defendant, Buckles, was Miss Ellen Turner, the only daughter of George Turner, a substantial and prosperous farmer and real estate dealer of Jefferson county. She married plaintiff, J. P. Rush, in January, 1906. Two children, both girls, were born to them, Anita, fourteen years old at the time of the trial, and Georgine, three years old. They resided in Shepherdstown and at various other places in the near vicinity, at one time in Wilmington, Delaware, where plaintiff was employed in the shipyards. Plaintiff was not very successful in business affairs, and Turner, the father-in-law, had, during all their married life, contributed money for the support of the family and had helped in many ways to aid him in making a living for them. A portion of the time the rent from one of his houses in Shepherdstown was paid to his daughter, Mrs. Rush, to assist her in obtaining clothing for herself and children and for other living expenses. On several occasions Rush and his wife had disagreed, and their nuptial relations had been interrupted thereby to such an extent that she had frequently left home and gone to her father's house, and on visits to her relatives, staying away from two weeks to a month

or so at a time, but always returning, until this occasion, the separation in April, 1920, when she declared she never would return, and to this time has adhered to her declaration.

It appears that in 1917 Rush obtained employment at Wilmington, Delaware, in the shipyard at that place, but after the armistice returned to Shepherdstown in December, 1918. He had no employment; and having often expressed a desire to engage in farming, had requested his father-in-law, who was fairly wealthy for that locality, to buy a farm for his occupancy and use. Accordingly, Mr. Turner purchased a farm four or five miles from Shepherdstown, paying about $6,000 therefor, for the use and occupancy of Rush and his family, lending him some farming implements and machinery which he, Turner, owned. Rush and family moved onto the farm in the spring of 1919 and lived there until April, 1920. During all this time Mr. and Mrs. Turner assisted them by furnishing money to buy clothing and other necessaries, frequently going out to the farm and performing manual labor thereon so far as they were able.

It appears that in April, 1920, the father-in-law was at the farm when an altercation arose between him and Rush over some improvement of the farm, which resulted in vicious words on the part of Rush addressed to the old gentleman, accompanied by a blow from his fist and other personal violence which drew blood from the old man's face or ears. Turner was sixty-five years old at the time and crippled with rheumatism. Mrs. Rush, who heard the conversation and witnessed the affray, and who assisted her daughter in rescuing her father from the assault, became highly angry and nervous and then told her husband that "he was a brute and she was going to leave him and never live with him again as long as she lived." Within an hour she had packed her suit case and left home in the car of a neighbor, accompanied by her father, taking her small child with her. The older girl, in company with a girl friend, went to school at Shepherdstown, leaving before the mother. Rush seemed to agree to her departure, and had a horse hitched to a buggy for that purpose, but as above stated she left in the car of a neighbor, and went to her father's house in Shepherdstown where she staid an hour or two, and from there she took her youngest

child and visited various relatives in Virginia, Maryland and near Shepherdstown in this state, until about the first of September following when her father procured for her two rooms at the Rumsey hotel in Shepherdstown, in order that the children could attend school at that place. She moved into these rooms with her children, her father paying all her living expenses and visiting her and the children daily and attending to their wants. She occupied these rooms until the following April when she went to her father's house and remained there until about the middle of May when she left, without the knowledge of her father, for the state of Nevada where she has since resided with her youngest child. It appears that from the time she left her husband in April, 1920, he made no effort to have her return and had no communications with her. After she had occupied the rooms at the Rumsey hotel for some time, being supported and cared for by her father, Rush conceiving that the father-in-law had alienated her affections, instituted a suit against him, at December rules, for damages for such alienation, laying them at $30,000. The father-in-law employed attorneys to defend the action for alienation and proceeded to prepare for his defense. About the middle of February, 1921, opposing attorneys in that litigation had a conference without the knowledge of Turner, the defendant, and it appears that Mrs. Rush was, through that conference, brought into communication with her husband, with the result that the suit against the father was dismissed. Rush claims that he was under the impression that his wife agreed to return to him if the suit was dismissed. He is not very positive in that statement. On the other hand, Mrs. Rush says she was careful to leave no such impression with him, that she made it clear to him that there would never be any chance of a resumption of the family relations as long as he had litigation pending against her father; that she would consider a reconciliation if he would withdraw the suit. While the suit was pending some time prior to its dismissal Rush visited his wife at her rooms in the Rumsey hotel, and was received by her in a manner which would indicate that she was considering a resumption of the marital relations. He would bring her milk and butter and articles of produce from the farm, and she would often

receive him with some apparent degree of affection. No reconciliation was effected and no marital relations resumed. She told him she would never live with him in that community, and being under the impression that she would live with him elsewhere he went to Baltimore in the spring of 1921 where he obtained employment in a department store and rented two rooms and wrote for his wife to come there. She did not go. She says it was never her intention to go or to ever live with him again. On the contrary, she spent about a month at her father's house prior to the middle of May when she went to Nevada as above stated, where she has since resided and where she says she went for the purpose of obtaining a residence and instituting a suit for divorce. At the time her deposition was taken in this litigaton she had obtained her divorce in that state. She says she had fully made up her mind when she left him in April, 1920, to go to some western state and obtain a divorce, and with that object in view she systematically retained money given to her by her father for her support, making him believe she was using it all for her maintenance.

Defendant, Buckles, had been occupying rooms at the Rumsey hotel for a year or so before Mrs. Rush went there. He was married, but had become estranged from his wife, and at that time owned and operated a garage in Shepherdstown and dealt in automobiles. He frequently visited Mrs. Rush at her apartments, mostly at night, and on several occasions sent her candy and took her out driving in his automobile, often accompanied by her oldest daughter and other friends. It is in evidence from the lips of the oldest daughter that when other callers would come to the apartment when the defendant Buckles was there, he would frequently secret himself in the closet or under the bed in the adjoining room until their departure; and at one time when she came to the apartment about 4 o'clock in the afternoon she found the door locked, and after it was opened Buckles and her mother were in the room. When Mrs. Rush left for the state of Nevada she was accompanied by Buckles, and when they arrived at Winnemucca, a small town in that state, which had been selected by Mrs. Rush as the place to acquire her residence, they registered at the best hotel in their own proper

names and as from Shepherdstown, West Virginia. They were assigned by the hotel management to rooms which adjoined, and on the following day Mrs. Rush secured apartments elsewhere, but not being satisfied returned to the hotel on the following day and was assigned another room in a different part of the house, where she remained for some time until she obtained respectable quarters elsewhere. The evidence of the hotel owner and clerks was taken, from which it appears that there was nothing suspicious about the actions of the parties and that the hotel management was careful that no improprieties should be carried on in the hotel. Mrs. Rush in her deposition details her relations to Buckles, whom she had known in her childhood days, and says that she never had any affection for him, that he frequently called at her apartments in the Rumsey hotel and that she treated him as any other friend; that when she informed him that it was her intention to go to Nevada for the purpose of securing a divorce he conceived the idea of going along for the same purpose—that is, to secure a divorce from his wife, from whom he had been estranged, but that there was no understanding that they should marry, no affection between them and no pre-arrangements of any kind; that he did not furnish her any money; that soon after he went to Winnemucca he went to other parts of the state for the purpose, as he said, of viewing opportunities for entering into business in that state; that he returned to West Virginia after staying there a short while, and that she had never seen him since; that she had received letters from him in relation to this suit and had promised him or his attorneys to give her evidence. She denies any improper relations with him, and says there is no affection or understanding between them whatever any more than there is between her and other friends. She says she had been partially supporting herself in Nevada by singing, and teaching music. On the point at issue, whether or not he, Buckles, had alienated or partially alienated her affections for her husband she says he had not done so in the slightest degree; that she had no affection for her husband to be alienated; that when the brutal assault was made upon her father, in April, 1920, her "heart was stone and it remained stone," and she then made up her mind never to live again

with plaintiff; that she had lost all affection for him and had intended, as soon as she could do so, to obtain a divorce from him with the least publicity. Corroborating her on this point is the testimony of her father, who was introduced as a witness by plaintiff. Interrogated about the circumstances of her leaving her husband and the cause thereof, he said: "She was stark crazy when she saw his brutal action. I cannot remember what she said, I begged and pled with her not to go. I didn't want the humiliation of it. I told her she didn't have to worry about me—that didn't make any difference. But it didn't do her no good. She declared she would walk to Shepherdstown and carry her suit case. I was compelled to go and find some way for her to get away." "Q. Will you state whether or not your daughter has had any affection for her husband since that time? A. I firmly don't believe. I don't think she has. Q. What made her leave home? A. I suppose if that hadn't happened she would have been with him yet, I reckon. They had separated temporarily several times but she would always go back again, but that was the climax. I saw that when it first happened. It was too desperate for her to stand it. I felt the same way myself." The oldest daughter, Anita, who was also examined as a witness for the plaintiff, on this crucial point of alienation of affections, when interrogated about the visits of her father to the mother in the Rumsey hotel while the suit was pending against the father-in-law, said that her mother received him with some show of affection but that "She was sneaking," that she had no love or affection for her husband, and that she Anita, knew that her mother had not. She said her mother was fooling her father, in order to get him to dismiss the suit he had brought against the old gentleman; that she didn't love her father as she pretended to do and never had from the time her husband struck her father (Turner) and made the blood run down his face. On the other side, we have the evidence of plaintiff that he understood that his wife would be reconciled to him if he would dismiss his suit against her father, and that about that time he visited her and had partially regained her affections with a tentative agreement that they would resume marital relations. To support the claim of the alienation of the affections

which he said his wife then had for him or was about to resume, he points to the presence and actions of Buckles at the Rumsey hotel, and the fact that he had accompanied her to Nevada; and that at one time he, Buckles, had told her father that he was fond of Ellen, meaning his daughter. Buckles did not testify in his defense. It is argued that these circumstances and these actions of Buckles proved conclusively that he was designedly seeking to and did accomplish the alienation of the affections of the wife from the husband. On this issue and under these facts and circumstances the jury found for the defendant.

We have detailed at considerable length the testimony for the reason that the verdict was set aside because the evidence was not sufficient to warrant such finding. The crucial question before the jury was whether defendant either wholly or partially alienated the affections of the plaintiff's wife, or prevented a reconciliation between them and a resumption of the marital relations. On this question the court correctly propounded the law. The jury were told that if they should believe from the evidence that plaintiff's wife had become estranged from him by reason of the altercation between him and her father, and even if they should further believe that her affections for him had not been restored, yet if they believed that defendant, knowing of such estrangement, induced, persuaded or aided in any way in causing the plaintiff's wife to leave him and go to the state of Nevada, either for the purpose of thereafter marrying her or for any other wrongful or unjust purpose; and if they should believe from the evidence that during the time of such estrangement plaintiff was endeavoring to restore his wife's affections, and if they believed that by attentions and acts of devotion to plaintiff's wife defendant interfered in plaintiff's efforts to gain his wife's affections and thereby prevented him from so regaining her affections, they should find for the plaintiff. The jury were further told that the husband is entitled to the association and companionship of his wife so long as the bonds of matrimony continue, and that no stranger has a right to intervene to prevent him from having such companionship and association; that he is entitled to the companionship and help of his wife in the care, training and

raising of the children; and, therefore, if the jury should believe that Rush had temporarily lost his companionship and affection of his wife, was trying to regain the same, and that defendant Buckles by his attentions to and association with the wife prevented him from regaining her companionship, that such conduct on the part of the defendant was unjustifiable and inexcusable; and in that event it would be the duty of the jury to find for the plaintiff in such sum as they thought he had been damaged.

Many cases hold that there may be a recovery for partial alienation of a spouse's affections. *Nichols* v. *Nichols,* 147 Mo. 387, 48 S. W. 947; *Fratini* v. *Caslani,* 66 Vt. 273, 29 Atl. 252. In *Dallas* v. *Sellers,* 17 Ind. 479, the supreme court of that state said that even if the wife had no affection for her husband the defendant had no right to interfere to cut off all chance of its springing up in the future. And in *Prettyman* v. *Williamson* (Del.), 39 Atl. 731, it was held that if the wife and husband lived unhappily together before the defendant appeared, and even were much estranged, that would not constitute a bar to the plaintiff's action, but would go in mitigation of damages. Accord: *Miller* v. *Pearce,* (Vt.), 85 Atl. 620. It was held in the *Prettyman case* in the 12th point of the syllabus: "A husband cannot recover for the alienation of his wife's affections if the injury was the result of his own cruelty or misconduct, unless it appear that defendant prevented a reconciliation." It is well settled that if another, by advice or enticement, induces a wife to leave her husband or takes her away without his consent, encourages her to remain away and prevents communication between the husband and wife or prevents a reconciliation, he does such at his peril and is liable. *Schouler Dom. Rel.* 41, and cases cited. *Boland* v. *Stanley* (Ark.), 115 S. W. 163. In the last cited case the court held that where nothing is said or done to cause a wife to abandon her husband, her act being of her own accord and for reasons best known to herself, there is no cause of action for alienation of her affections. The controlling cause of the loss of the wife's affections, either wholly or partially, must be the misconduct of the defendant in order for plaintiff to recover. *Rash* v. *Pratt* (Del), 111 Atl. 225. The attempt to alienate must be

successful, or there is no cause of action. *VanOlinda* v. *Hale,*
88. Hun. 452.  The principle of law which the plaintiff asserts
for recovery and which he claims was disregarded by the
jury, is that a stranger has no right to interfere in any manner
to prevent a reconciliation between husband and wife who
have become estranged, and thus partially, at least, alienate
her affections.  The interference, of course, must be culpable
and calculated to produce that result.  However, where the
evidence introduced to substantiate such facts is contra-
dictory, it becomes a question for the jury and not for the
court.  *Servis* v. *Servis,* 172 N. Y. 438.

It will be seen from the substance of the instructions given
that the court fully and carefully instructed the jury accord-
ing to the principles above set out.  There is no substantial
disagreement between plaintiff and defendant as to the law.
But plaintiff insists that the evidence, the substance of which
has been detailed, vastly preponderates in favor of a recovery
for plaintiff.  It is insisted that the evidence shows that
Buckles persistently addressed his attentions to Mrs. Rush
for the purpose of preventing a reconciliation and to secure
her affections, and the fact that he accompanied her to Nevada
is conclusive that he had such motive or had some ulterior,
unlawful purpose.  It is argued that if it had not been for
the intervention and attentions of Buckles Mrs. Rush would
have returned with her children to her husband; and that
his influence over her continued to the time she gave her
deposition, and induced false testimony on her part.  The
credibility of witnesses is peculiarly within the province of
the jury.  We cannot see that the preponderance of the
evidence is with the plaintiff to establish the fact that there
was any possibility of reconciliation between plaintiff and his
wife.  The only evidence which tends to establish that fact
is that of plaintiff himself, supplemented by his visits to his
wife at the Rumsey hotel while the suit against her father
was pending.  He says she promised to return to him if the
suit was dismissed.  She flatly denies it.  The preponderance
of the evidence, that she never intended to live with him again
is on the side of defendant.  Her father, who raised her, says
that he realized the climax had come when the assault was
made.  That he pled with her not to leave, but she had firmly

made up her mind to do so, and there was never any indication on her part afterwards that she had changed her mind. The oldest daughter, Anita, testified that her mother was fooling her father, had no affection for him, and there was no chance of a reconciliation. William and Thomas Turner, her bachelor uncles, whom she visited after leaving her husband, testified to the same effect. It was within the province of the jury to weigh this testimony in conjunction with the positive assertions of Mrs. Rush to the same effect, as against the testimony of the plaintiff, buttressed by the uncontroverted fact that Buckles paid some attention to her and accompanied her to the west. The jury evidently came to the conclusion that plaintiff failed to prove to their satisfaction that Buckles had in any degree alienated the affections of the wife from the husband or prevented a reconciliation.

A new trial should not be granted in a doubtful case where there is conflicting evidence, because the judge, if he had been on the jury would have found a different verdict. *Mays* v. *Callison,* 6 Leigh, 230; *Sigler* v. *Beebe,* 44 W. Va. 587; *State* v. *Sullivan,* 55 W. Va. 597. The general rule is that where a new trial is asked for on the ground that it is contrary to the evidence, and it has been denied, the opinion of the trial court is entitled to great respect in the appellate court, which will not grant such new trial only in case of a plain deviation from right and justice. *State* v. *Hunter,* 37 W. Va. 744; *Gilmer* v. *Sydenstricker,* 42 W. Va. 52. It is well settled that where evidence is conflicting, but it is evident that the verdict is against the clear weight of the evidence, the trial judge should set the verdict aside and grant a new trial, but always with extreme caution. When this is done, the opinion of the lower court is entitled to peculiar respect, and the appellate court will not reverse such order unless it is plainly wrong. *Martin* v. *Thayer,* 37 W. Va. 38; *Robertson* v. *Harmon,* 47 W. Va. 500. We have followed this rule and have accorded due weight to the opinion of the learned trial judge in setting aside this verdict; but a careful inspection of the evidence has led us to the conclusion that the preponderance is not with the plaintiff, and the questions of fact upon conflicting testimony being peculiarly within the province of the jury and entitled to superior weight to that

of the court we have come to the conclusion that the verdict ought not to have been disturbed. It does not manifestly appear that the verdict was moved by passion, prejudice or other influence, nor is it plainly against the clear and decided preponderance of the evidence; or that it should be set aside because of an imperial demand for justice.

The judgment of the circuit court in setting aside the verdict is reversed; the verdict reinstated, and judgment of *nil capiat* will be entered thereon in this court.

*Reversed; verdict reinstated; judgment entered here.*