V. E. REESE AND MATTIE REESE

v.

C. H. LOWRY AND THOMAS JAMES, DOING BUSINESS AS KALAMAZOO SALES AND SERVICE COMPANY OF OAK HILL, *et al.*

(No. 10657)

Submitted January 26, 1955.  Decided March 22, 1955.

*J. Campbell Palmer, III, Carl B. Vickers,* for plaintiffs in error.

*Mahan, White & Higgins,* for defendants in error.

RILEY, JUDGE:

In this action of trespass on the case, instituted in the Circuit Court of Fayette County by V. E. Reese and Mattie Reese against C. H. Lowry and Thomas James, partners doing business as Kalamazoo Sales and Service Company of Oak Hill, and Kalamazoo Stove and Furnace Company, a corporation, plaintiffs sought to recover from defendants damages for the destruction by fire of plaintiffs' dwelling house and the contents thereof, situated in the Town of Dothan, Fayetteville District, Fayette County, alleged to have been caused by the negligence and improper instal-

lation by the defendants of a furnace installed for the purpose of heating plaintiffs' dwelling house. To a judgment of the circuit court setting aside a verdict in favor of plaintiffs against the defendants, C. H. Lowry and Thomas W. James, in the amount of five thousand dollars, and granting the defendant partners a new trial, plaintiffs prosecute this writ of error. The plaintiffs moved the court that they be permitted to take a nonsuit against the corporate defendant, which motion was granted.

The dwelling house alleged to have been destroyed by reason of the carelessness and negligence of the defendants originally consisted of a four-room house or shack, situated on approximately 3.2 acres of land, obtained by plaintiff, V. E. Reese, in the course of the trade of a 1942 Ford automobile valued at the time of the trade at fifteen hundred dollars. At the time of the fire on December 17, 1951, the dwelling house had been expanded by the plaintiff, V. E. Reese, who had been a carpenter for forty-two years, to a house of seven rooms, with a bath and porch, the improvements resulting in enlarging the house from 24 x 28 feet to 24 x 40 feet, the installation of eight additional windows, a complete electrical rewiring of the house, and the installation of plumbing to service the house with running water, so that at the time the house was destroyed it had a value, according to the testimony of V. E. Reese, of six thousand dollars, which value is not questioned in this record nor on this writ of error. In addition to the destruction of the house itself, there was proof of loss of V. E. Reese's carpenter tools and certain specified effects belonging to Mattie Reese, the wife of V. E. Reese, which brought the total amount of the destroyed property to something more than seven thousand dollars.

As the verdict of the jury was in plaintiffs' favor and against the individual defendants and the circuit court set aside the verdict, we in the appraisement of this case should apply the rule enunciated in point 1 of the syllabus of the case of *Fielder, Admx.* v. *Service Cab Co.,* 122 W. Va. 522, 11 S. E. 2d 115, that: "Before directing a verdict in defendant's favor, every reasonable and legitimate infer-

ence favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence", which rule was reiterated and adopted in the cases of *State ex rel. Bumgarner* v. *Sims, Auditor,* 139 W. Va. 92, 79 S. E. 2d 277; *Spence* v. *Browning Motor Freight Lines,* 138 W. Va. 748, 77 S. E. 2d 806; *Frampton* v. *Consolidated Bus Lines,* 134 W. Va. 815, 823, 62 S. E. 2d 126; *Laphew* v. *Consolidated Bus Lines,* 133 W. Va. 291, 294, 55 S. E. 2d 881; *Billy* v. *Powell,* 133 W. Va. 278, 282, 55 S. E. 2d 889; and *Boyce* v. *Black,* 123 W. Va. 234, pt. 1 syl., 15 S. E. 2d 588.

Plaintiffs' case was properly submitted to the jury on the theory embraced in plaintiffs' instruction No. 1 and plaintiffs' instruction No. 4, as amended, both of which were based upon the hypothesis that the jury could find the defendants guilty of primary negligence, if the jury should find from a preponderance of the evidence that the defendants were guilty of primary negligence in that they sold and installed a furnace improperly and negligently in plaintiffs' dwelling house, which negligence was the proximate cause of the fire which destroyed the dwelling house, which instructions submitted to the jury the question whether the plaintiffs, or either of them, were guilty of negligence which proximately contributed to the fire. Likewise the trial court gave proper instructions which fully set forth defendants' theory of defense, which, in particular, submitted to the jury defendants' theory that the jury could find by a preponderance of the evidence that plaintiffs were barred by contributory negligence.

On this writ of error only two questions are presented: (1) Was the evidence contained in this record sufficient from which the jury could find by a preponderance thereof that defendants were guilty of negligence, which proximately caused the fire which destroyed plaintiffs' dwelling house and the contents thereof; and (2) were the plaintiffs themselves guilty of negligence which proximately contributed to plaintiffs' alleged loss?

Some time after the plaintiff, V. E. Reese, had completed substantially the enlargement and improvement of his dwelling house, the plaintiffs entered into a contract with the defendants, Lowry and James, who were engaged in business in the Town of Oak Hill, Fayette County, to install and service furnaces and heating systems, whereby said defendants agreed to install in the basement of plaintiffs' house a forced air heating system for a specified sum. In the latter part of October, 1951, the defendants in furtherance of the provisions of their contract installed in the basement of plaintiffs' home a Kalamazoo hand fired coal burning furnace with blower fan, thermostat, limit and other controls, which consisted of ducts for the transmission of warmed air to the various rooms of the dwelling house and cold air returns. After the installation was made the system was apparently in good operating condition and remained so until two days before the fire which destroyed plaintiffs' dwelling house on December 17, 1951. This appears from the fact that the furnace was operated intermittently from November 10, 1951, the date upon which the installation was completed, until December 17, 1951, the day on which, according to the plaintiff, V. E. Reese, the thermostat regulating the drafts failed to work.

Prior to the installation of the furnace the plaintiff, V. E. Reese, inquired of the defendant, Thomas James, how much space or excavation would be required for a furnace of the kind and size which plaintiffs had purchased. Reese did not know how much space was required to install a furnace, but in making the excavation in the basement of the dwelling house for the purpose of such installation he followed defendant James' directions.

On December 17, 1951, the day of the fire, Mrs. Reese during the early afternoon had left Oak Hill by bus, and her husband, V. E. Reese, after having his evening meal at the nearby home of his wife's sister returned to the dwelling house about eight o'clock. At that time the weather was cold and there was some snow and a great deal of wind. In order to keep warm, he testified that not-

withstanding the thermostat which served to close the drafts on the furnace was not working, he put quite a bit of coal in the furnace, and then went to sleep in the bedroom which was next to the dining-room of the dwelling house and connected with the living-room by French doors. About ten o'clock that night he was awakened by smoke, and going into the dining-room he saw fire in the living-room, the flames actually coming up between the boards at a place directly over the furnace. Witness proceeded into the living-room with a bucket of water to quench the fire, but was repelled by fire coming through the French doors into the dining-room. The fire immediately started to spread rapidly. Notwithstanding neighbors came to Reese's assistance, and later the Oak Hill volunteer fire department came, the house was completely destroyed.

Reese testified that on December 15, 1951, two days before the fire, he discovered that "the thermostat was not working"; and the draft on the furnace would not close. On December 17, 1951, the day of the fire, Reese gave notice to Mrs. Lowry, wife of the defendant C. H. Lowry, and sister of the other defendant, Thomas James, that the drafts on the furnace would not operate and that the thermostat was not working.

The evidence tending to establish that defendants were guilty of primary negligence, which proximately caused the fire, which destroyed plaintiffs' dwelling house, is in direct conflict. Though the evidence varies in minor details, there is probative evidence contained in this record to the effect that the space between the top of the furnace, or the plenum, from which the hot air is distributed, was from one inch to one inch and three-quarters from the joists, and that there was no asbestos or other fire resisting material above the furnace on the joists, or sand, as was usual in the case of older makes, on top of the furnace. Likewise there is evidence, probative in its nature, which tends to show that the top of the furnace between the joists and between the pipe leading to the chimney from the furnace was hot.

At this point we note that counsel for the defendants admit in their oral argument and brief that the evidence in this record is sufficient for the jury to determine that the furnace was improperly installed by the individual defendants, in that the top of the plenum was within an inch or an inch and three-quarters of the joists, and that no insulation was placed either on top of the furnace and plenum or along the joists over the furnace. But notwithstanding the evidence was such that it was a question for jury determination whether the individual defendants were guilty of negligence initially in the installation of the furnace, nevertheless, the plaintiffs cannot recover for the reason, as counsel for the defendants contend, the record does not contain sufficient probative evidence from which the jury could have found that the alleged negligent installation of the furnace was the proximate cause of the destruction of plaintiffs' dwelling house.

This case having been originally submitted to this Court on September 1, 1954, the Court, on December 12, 1954, as shown in the opinion contained in 83 S. E. 2d 693, reversed the judgment of the Circuit Court of Fayette County in setting aside the verdict of the jury in plaintiffs' favor and awarding defendants a new trial, and reinstated the verdict of the jury and entered judgment in this Court on the verdict in plaintiffs' favor.

On this rehearing of the case counsel for defendants take the positions: (1) That though the evidence bearing on the question of defendants' negligence in the installation of the furnace is sufficient for jury determination, the plaintiffs have failed to establish by a preponderance of the evidence that the alleged negligence of the defendants was the proximate cause of the destruction of plaintiffs' dwelling house by fire; and (2) the record discloses that the plaintiffs themselves are guilty of contributory negligence, as a matter of law, which would bar recovery and which justifies the action of the trial court in setting aside the verdict of the jury in plaintiffs' favor.

In view of the admission of counsel for the individual defendants that the furnace was installed in plaintiffs' dwelling house so that the top of the plenum was within an inch or an inch and three-quarters of the overhanging joists, and that no fire resisting insulation was installed over the plenum and the top of the furnace or along the joists, the testimony of plaintiffs' witnesses, Thomas F. Whelan, H. A. Kincaid and John M. Thompson, bears most pertinently upon the question whether this record contains sufficient evidence from which the jury would be entitled to find from a preponderence thereof that the proximity of the plenum to the overhanging joists and the absence of insulation proximately caused the fire which destroyed plaintiffs' dwelling house.

Plaintiffs' witness, Thomas F. Whelan, who had been engaged in the heating and plumbing business in the City of Charleston for about twenty-seven years, and who had been employed as piping superintendent for the Standard Engineering Company of the City of Washington, testified that "The furnace and the plenum being too close to the *wall*" was the cause of the fire which destroyed plaintiffs' dwelling house. This answer was elicited from the witness in response to a hypothetical question, which fairly assumed the probative facts contained in this record, tending to support plaintiffs' theory of the case on the question whether the alleged negligence of the defendants in the installation of the furnace was the proximate cause of the fire. This question assumed the following facts, all supported by the evidence: "That a furnace was installed in the Reeses' home which was completed on or about November 10, 1951, being a Kalamazoo coal-fired furnace, with electrical thermostatic connections and a blower; that this furnace was installed with a lip of a quarter to an eighth of an inch around the outside edge; that the top of the furnace was from an inch to an inch and three quarters below the wooden joists; that the thermostatic controls, the electrical ones, were not in operating condition, so that the drafts remained open at all times; that in this home there was no other heat by reason of gas or any

other material except on the day of the fire in the morning there had been a coal stove lit in the kitchen, which had gone out. I will ask you further to assume that after the fire had started, the electric light which was connected on the same circuit with the furnace, when it was turned on went on and stayed operating for some time. I will ask you to assume that about 8 o'clock at night Mr. Reese put coal into his furnace sufficient to last for a chilly night; that thereafter he was awakened, about two hours afterwards, the coal being put on about 8 o'clock and about 10 o'clock he was awakened, and on coming out of his bedroom into his dining room he saw, through the glass doors, fire burning on top of the place in the living room, in the floor on top of the place where the furnace was below. * * *"; and in addition assumed the facts which the witness in his testimony had related as to what he found on the premises a short time after the fire. Then the witness was asked, "Assuming that the thermostat was in the condition I have told you [that the thermostatic controls, the electric ones, were not in operating condition, so that the drafts remained open at all times] and would not close the drafts at all or allow them to be closed, would that aid in causing the fire to catch", to which he answered, "I would say it would."

Plaintiffs' witness, H. A. Kincaid, a resident of Oak Hill, who had been engaged in the heating and plumbing business, including the servicing and installation of furnaces, for twenty-nine years, and who had made a detailed examination of the Reese premises a short time after the fire was asked by plaintiffs' counsel, Mr. Palmer, to assume: "That this furnace that you saw out there was installed within an inch and three-quarters of a joist without any insulation between the two; that the thermostat on the day of the fire, the night of the fire, was not working, so that the drafts were kept open all the time; that there was no gas of any kind in the house; there was no other fire in the house of any kind; that when the electric lights, which were on the same circuit as the furnace, were turned on during the fire, they went on; that the furnace

was fired about 8 o'clock by putting enough coal in, ample coal to keep the house warm during a cold night, and that about 10 o'clock Mr. Reese was awakened by the smell of smoke or heat and in going to his dining room saw, through the French door, fire in the living room directly over the furnace and not at any other place. In your opinion what would have been the cause of that fire that broke out", which hypothetical question was corrected at the objection of counsel for defendants, by inserting the assumption that the night before the fire Reese was under the house with a blow torch attempting to thaw out water pipes which had frozen; and Kincaid was further asked by defendants' counsel to assume that: "In addition to what I have stated about the blow torch, that the thermostat was connected to a motor which worked on an electric current, a magnetic current, which had an arm on it that raised and lowered the drafts; that there was on the furnace a limit control, with which I take it you are familiar; that the furnace over a period of approximately five weeks since it had been installed in this home had been used only intermittently; that there was in the basement a sump-pump operated by electricity; that there was an electric water-heater in the house operated by electricity; that the fan on this furnace was in proper working order and was working. I can't now remember, your Honor—I know I have something else in my mind, but those elements at least appear from the record also"; and to the question addressed to witness by counsel for plaintiffs: "Assuming all of the facts which I have related to you and which Mr. Higgins has related as amending my question as being true, and assuming that a fire started on this particular night should burn the house down and, as I say, taking all of the facts as true, what in your opinion was the cause of the fire", the witness answered, "Well, I couldn't say that the furnace was the cause of the fire. It would be natural to assume that it was." Then further pursuing his inquiry, counsel for plaintiffs inquired, "What would be your opinion—your opinion, your belief", to which witness replied, "From what I have heard and what I have seen, I would think the furnace was."

Assistant State Fire Marshal John M. Thompson testified that within a month or so after the fire he had been detailed by his superior to make an investigation of the fire for the purpose of determining the cause thereof. In the course of this investigation he examined the premises, interrogated persons who might throw light on the cause of the fire, and submitted an official report. His testimony bearing on the cause of the fire was not as positive as that of the witnesses Whelan and Kincaid, and is of such character that it can be appraised only by a somewhat detailed consideration thereof. He testified that from what he saw on his examination of the premises after the fire, he was not able to determine the cause thereof; and in answer to the question addressed to him by counsel for plaintiffs: "I will ask you to assume that the top of the furnace in that house was put in so that the top of the furnace was within one inch to one and three-quarters inches of the joists, and I will ask you, assuming that to be true, whether in your opinion, without any insulation between the top of that furnace and the joists, that was safe practice or otherwise", the witness answered, "Well, that depends greatly on the condition of the furnace. If the thermostat was working, why, it would not be as dangerous as it would if you had a defective thermostatic control." To the inquiry "Whether the thermostat was working at the time or not, would it be safe to put that in where you had to depend on the thermostat", he answered, "Well, it is not the required height", and further testified that the required height was "a minimum of three inches." The question addressed to him by counsel for the plaintiffs, "If the thermostat did not work or became defective, state whether or not a furnace installed that close to a floor could become dangerous", elicited the answer, "It is possible"; and to the further inquiry, "Well, is it probable", the witness answered, "Yes, it is probable." Then witness was asked what, in witness's opinion, would have been the cause of the fire, assuming the facts contained in the question "that the furnace was installed within an inch or an inch and three-quarters of the joists, with no insulation; that the thermostats were not working, at least insofar

that they kept the drafts open all the time; that the electricity was apparently working by reason of the lights going on when turned on during the fire, and that the lights were connected on to the same circuit as the furnace; that there was no gas of any kind in the house and that the kitchen stove, which was a coal stove, had been out since noon and the fire occurred about 10 o'clock in the evening, approximately ten hours; that when seen, the fire or flame, when first seen, were directly over the the furnace and no other place; * * *", to which question the witness answered evasively, "Where there is a lot of material in the furnace room—there could have been some other material in the furnace room." When, however, he was corrected by counsel for the plaintiffs, "I am asking that you take as true only those facts and nothing else, sir," the witness answered, "Well, under that condition I would say, if there was no other heating element in there, that could have been the only reason for the fire." To the inquiry of counsel for plaintiffs, "What could have been", the witness answered, "The furnace, or the heat from the furnace." Further on in direct examination the witness was asked by plaintiffs' counsel to assume the facts which had been stated in the hypothesis to counsel's former question and state, "Whether or not in your opinion the fire originated by reason of the furnace being too close to the floor, together with defective thermostats," witness answered, "That could have caused the fire"; and finally the questioning on direct examination proceeded with the question, "In your opinion did it, assuming the facts I have given you to be true", to which witness queried, "Eliminating all other sources", and counsel answering, "Yes," received in return the answer, "Yes."

The adroit cross-examination of plaintiffs' witness, John M. Thompson, by counsel for the defendants tended to weaken materially Thompson's testimony elicited on direct examination, but not to such extent as to render the testimony beyond jury consideration on the question of proximate cause. On cross-examination in answer to the question: "After all of your examination there, Mr.

Thompson, on the spot, are you able to tell this jury what caused the fire", the witness answered, "I am not." And further on cross-examination this witness stated that he doubted seriously that the plenum chamber could have become hot enough to set the overhead joists on fire, if the fan on the furnace had been in proper working order on the night of the fire, and assuming the other facts which had been given to the witness; and to the further question addressed to Thompson on cross-examination that "If the drafts were open themselves and the fan was working, could the plenum chamber have become that hot", elicited from him the answer, "I don't think so, unless you had a terrible fire in the box, because you are taking the air off of it, the superheated air off of it."

The hypothetical questions addressed to plaintiffs' witnesses Whelan and Kincaid, and the answers elicited in response thereto from the witnesses fully set forth plaintiffs' theory of this case, and having considered this record in the light of the holding of this Court in *Fielder, Admx.* v. *Service Cab Co., supra,* we are of opinion that the record contains sufficient probative evidence which would entitle the jury to find, as it did, that the defendants, C. H. Lowry and Thomas James, partners doing business as Kalamazoo Sales and Service Company of Oak Hill, are guilty of negligence in the installation of the furnace in plaintiffs' dwelling house, which proximately caused the total destruction thereof by fire. That being so, the trial court erred in setting aside the verdict of the jury in plaintiffs' favor and granting the defendants Lowry and James a new trial, unless, as a matter of law, the plaintiffs themselves were guilty of negligence which primarily contributed to the burning of their dwelling house.

Where, in an action to recover damages for negligence, the plaintiff has proved for jury determination that the defendant was guilty of actionable negligence, and the defendant relies upon the defense of contributory negligence, the defendant has the burden of proving that plaintiff was guilty of negligence which proximately contri-

buted to plaintiff's injury, unless such negligence is disclosed by plaintiff's evidence, or may be fairly inferred from the circumstances portrayed by the whole record. An axiom in the law of tort liability is that in an action for negligence, contributory negligence is a matter of defense, the burden of proving which is on the defendant, and the plaintiff is not required to prove the absence of contributory negligence. *Dye* v. *Rathbone*, 102 W. Va. 386, 135 S. E. 274; *Bartley* v. *Western Maryland Railway Co.*, 81 W. Va. 795, 95 S. E. 443; *Riley* v. *West Virginia Central and P. Ry. Co.*, 27 W. Va. 145. To the effect that contributory negligence of the plaintiff in an action to recover damages for negligence is an affirmative defense, and that where the defendant relies on the contributory negligence of the plaintiff as a bar to recovery, the burden of proof rests upon the defendant to show such negligence, unless contributory negligence is disclosed by the evidence of the plaintiff, or may be fairly inferred from all the circumstances, see 13 M. J., Negligence, Section 56, and cases cited under notes 8 and 9.

Bearing directly on the question whether the evidence establishes that the plaintiffs, and in particular the plaintiff, V. E. Reese, were themselves guilty, as a matter of law, of contributory negligence, which would bar recovery, when on the cold night of December 17, 1951, with knowledge that the thermostat installed in an upstairs room was not working, Reese put quite a bit of coal in the furnace and then went to sleep in the bedroom of the house adjoining the diningroom, we note initially that this record contains sufficient evidence from which the jury could have found that the plaintiff, V. E. Reese, knew, or should have known by the exercise of reasonable care, that the heat generated by the fire in the furnace on the night plaintiffs' dwelling house burned, would have thrown sufficient heat on the floor and joists immediately above the furnace, so that then and there he could have reasonably anticipated that the fire in the furnace would in turn set fire to the floor and joists above, and ultimately destroy plaintiffs' dwelling house. But contrariwise, the evidence

in this case is such, in our opinion, that the jury could have found, as it evidently did by its verdict, that the plaintiffs were not guilty of negligence which proximately contributed to the destruction of their home.

At this point it is well to review the evidence contained in this record bearing on the question whether there is sufficient evidence for the jury to find by a preponderance thereof that the plaintiff, V. E. Reese, was guilty of contributory negligence which proximately contributed to the fire.

On cross-examination Reese testified that James had told him "how much to dig out in the basement for the furnace"; and that he "did dig the right distance he [James] told me, whatever he told me, and poured the base." Reese discovered that the thermostat did not operate, so that the drafts stayed open all the time, a condition which he discovered two days before the house burned; and that he tried manually to close the drafts without success. On redirect examination Reese testified that he had no knowledge that by putting coal in the furnace on Monday night, the night of the fire, that that would cause the house to burn.

From the record it appears that both the defendants Lowry and James were skilled in the art of installing furnaces such as the one installed in plaintiffs' house. James testified that he had been engaged in the appliance and home heating business for a little over three and a half years; and that in 1951 he and Lowry, as partners, sold the furnace to the Reeses. He also testified that he had training in the installation of furnaces such as the one installed in the Reese house, "primarily of the figuring of heat losses, and sizes of furnaces, and the layout of furnace jobs"; and that the actual installation of the furnace in the Reese house was done by defendants' witness Eric Anderson, with said defendants' witness Dallas Stotts as a helper.

The defendant Lowry testified that he started in the appliance and heating business at Oak Hill with his brother in law, the defendant James, in September, 1949;

that he had nothing to do with the installation of the furnace in the plaintiffs' home; that he did not recall any conversation with the plaintiff, V. E. Reese, as to the depth of the pit required for the installation of the furnace; that he made several trips with the men in the morning and in the evening during the course of the installation of the furnace; and that he had examined the width or distance between the lip around the plenum chamber and the joists above it, which he estimated to be about three inches.

Defendants' witness, Eric Anderson, who had installed the furnace for them, testified that he had been working in the business of installing furnaces of the type installed in the Reese house for about ten years; that the Reese furnace was installed so that the top of the plenum chamber was about three inches from the joists. This witness testified that he had studied the instructions as to the installation of Kalamazoo furnaces of the type of furnace installed in the Reese house, which instructions were issued by the manufacturer. The witness did not test the heat of the furnace with his hand in order to set the heat controls for "The controls is set from the factory."

That the plaintiff Reese on the night of December 17, 1951, placed quite a bit of coal in the furnace in order to keep warm, which may have resulted, to use the language of plaintiffs' witness, John M. Thompson, on cross-examination, in "a terrible fire in the box", with knowledge that the installation did not contain proper insulation and that the thermostat was not working, was established beyond peradventure in this case, cannot be gainsaid; and if this were the only factor bearing on defendants' liability, the trial court was justified in holding, as a matter of law, that plaintiffs were guilty of contributory negligence, which would bar them from recovery. But, as heretofore indicated, the defendants Lowry and James were skilled in the art of installing furnaces such as the one installed in plaintiffs' dwelling house, and the plaintiff Reese, whose skill was limited to his trade of carpentry, was unskilled in that art. The Reeses purchased this furnace from the defendants, the contract for which evidently provided for

all equipment of the furnace to be suited to the purpose for which it was installed. This is a typical case in which on the question of contributory negligence, the rule of comparative knowledge of its parties applies. 38 Am. Jur., Negligence, Section 185.

The fact that Reese on the afternoon before the fire had reported to the office of the defendants at Oak Hill that the thermostat was not working, in that it did not serve to close the drafts and check the fire in the furnace, so as to prevent overheating, does not establish that the plaintiffs were guilty of contributory negligence as a matter of law. This record discloses that the thermostat installed inside the dwelling house was installed for the purpose of regulating the heat in the rooms. Whelan on cross-examination testified that the thermostat upstairs can be set for seventy or seventy-five degrees, or whatever temperature the occupant desires. But the thermostat outside the furnace served only to regulate the heat in the house, and this record discloses that connected with the plenum on the top of the furnace there was a heat limit control, which we glean from the record is nothing more or less than a high degree thermostat, which is used for the purpose of preventing an overheat and which will check the fire in the furnace when the fire produces an overheat. Plaintiffs' witness Whelan on cross-examination was asked: "If that thermostat would not work and the limit control is in proper working order, no matter whether the drafts were closed or not by the action of the thermostat, then if the temperature of the plenum chamber reaches a certain setting, the limit control itself will close the drafts", to which he answered, "I would say that." The testimony of defendants' witness, Eric Anderson, who was employed by the defendants Lowry and James in the installation of the furnace in the basement of the Reese home, testified to like effect as to the installation of a limit control connected with the plenum chamber.

The defendant, Thomas James, demonstrating with "Defendants' Exhibit No. 12", which witness referred to as a

"combination furnace control" of the type which was installed on the furnace at the Reese home, testified:

> "This side of the control is what is known as the high-limit control, and it is set at approximately 200 degrees. When the temperature or if the temperature in the plenum chamber reaches 200 degrees, this high-limit switch will automatically close the drafts on the furnace. '

> "Now, on the other side is the fan control and it sets from 80 or 90 to 100 or 120, or somewhere along there, depending on how warm you want your house. Your fan comes on when the temperature reaches, say, 120, if that would be the setting, and then it cuts off when the room has been cooled down or when the temperature drops to 80 or 90, depending upon the setting of the control."

And further this witness testified that a long tube on the back of the limit-control "* * * goes back into the plenum chamber"; and that "The thermostat that is installed in one of the rooms of the house regulates the temperature." James also testified that if the room thermostat "is set at 70 and the temperature is 65, the dampers will be opened on the furnace."

As the Reeses used the furnace only intermittently during the course of clement weather immediately proceeding the day of the fire, the fact that on the occasion Reese made complaint at the office of the defendants in Oak Hill that the thermostat, which the record discloses was in the upstairs of the dwelling house and outside the furnace, did not serve to close the drafts, does not indicate, as a matter of law, that Reese knew that the firing of the furnace would create a dangerous situation. When Reese placed a quantity of coal in the furnace and immediately retired, he was not charged with notice that the high degree thermostat contained in the plenum was not working so as to control the fire, notwithstanding the thermostat in the upstairs of the dwelling house was not in working condition.

It was for the jury to determine whether Reese's banking of the furnace on the night of the fire caused such heat

to be generated that it burned plaintiffs' dwelling house. Reese's placing of a quantity of coal in the furnace on the night of the fire, and the consequent heat generated thereby is, in the opinion of this Court, only a remote cause of the disastrous fire. It is a remote cause in that it is an incident which happened which would have resulted in no injury, notwithstanding no injury could have occurred if it had not happened. *Anderson* v. *Baltimore and Ohio Railroad Co.,* 74 W. Va. 17, 81 S. E. 579, 51 L.R.A. (N.S.) 888. At the most the banking of the furnace on the night of the fire merely created a condition under which the fire which destroyed the Reese home was started. The applicable rule is stated in 38 Am. Jur., Negligence, Section 213: "If the plaintiff's acts merely created the condition under which the injury was received, it is proper to permit him to recover, notwithstanding they were negligent acts." See Section 213 for a full and detailed statement concerning the tests of proximate cause applicable to the alleged contributory negligence of a plaintiff. In point 2 of the syllabus of *Webb* v. *Sessler,* 135 W. Va. 341, 63 S. E. 2d 65, this Court held that: "The proximate cause of an injury is the last negligent act contributing thereto, without which such injury would not have resulted." In point 4 of the syllabus of the *Webb* case this Court stated: "In this jurisdiction there is a clear distinction between the proximate cause of an injury and the condition or occasion of the injury."

Evidently the drafts on the furnace were not working on the afternoon of the fire, because the thermostat located in one of the upstairs rooms of the house was not operating. As Reese went to bed shortly after he fired the furnace for the night, the failure of the high-degree thermostat to operate created an overheat, which was the last efficient cause of the floor and joists above the furnace catching fire.

A review of the record convinces us that this case, both on the question whether defendants were guilty of actionable primary negligence and whether plaintiffs were barred from recovery on the theory that plaintiff, V. E. Reese, was guilty of negligence, which proximately con-

tributed to the fire, was one for jury determination. The trial court in setting aside the verdict in favor of the plaintiffs, in our opinion, clearly invaded the province of the jury. Though we are well aware of the rule of practice prevailing in this jurisdiction that a trial court's action in setting aside a verdict for the plaintiff is entitled to peculiar weight on writ of error, *Flinn* v. *Henthorne,* 114 W. Va. 807, 173 S. E. 882; *Rush* v. *Buckles,* 93 W. Va. 493, 117 S. E. 130, a trial court's order setting aside a verdict in a plaintiff's favor will, nevertheless, be reversed by this Court on writ of error, when a consideration of all of the evidence clearly shows that the case was properly one for jury determination. *Flinn* v. *Henthorne, supra.*

In view of the foregoing, the former opinion of this Court in this case, contained in 83 S. E. 2d 693, is withdrawn.

We therefore reverse the judgment of the Circuit Court of Fayette County, in setting aside the verdict of the jury in plaintiffs' favor and awarding a new trial, reinstate the verdict of the jury, and enter judgment on the verdict in this Court.

> *Judgment reversed; verdict of the jury reinstated; Judgment on the verdict entered by this Court.*